

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00029-CV

IN THE INTEREST OF A.J.T.
AND R.A.C., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In one issue, Appellant A.T. appeals the termination of his parental rights to A.J.T. We affirm.

### II. Background

A.T. pleaded guilty to and was convicted of the aggravated sexual assault of a child—his stepson R.E.T.—and was sentenced to fifteen years' incarceration

---

[1]*See* Tex. R. App. P. 47.4.

in September 2011.  In January 2012, A.T.'s parental rights to A.J.T. and R.A.C. were terminated.[2]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (Q), (2) (West 2008 & Supp. 2012).  A.T. does not appeal the termination of his parental rights to R.A.C.[3]  Instead, A.T. challenges only the trial court's best interest finding with regard to A.J.T. and not the grounds for termination under family code section 161.001(1), conceding that "there was factually sufficient evidence" under section 161.001(1)(D) and (E) to support termination of his parental rights.[4]

## III.  Best Interest of the Child

A.T. complains that the evidence was legally and factually insufficient to support the best interest finding "when the Government failed to explore placement with the paternal grandmother, knowing that it was an option" because the Department of Family and Protective Services (DFPS) had been supplied

---

[2]At the termination trial, the trial court admitted A.T.'s 2011 conviction as well as his August 27, 1987 probation revocation for possession of a controlled substance (cocaine), his January 23, 1989 conviction for sexual assault, and his April 11, 2006 conviction for failure to comply with sex offender registration requirements.

[3]While A.T. is the presumed father of both A.J.T. and R.A.C., R.C. is R.A.C.'s alleged biological father.

[4]During the pendency of this case, Mother and R.C. repeatedly tested positive for methamphetamine and failed to complete their service plans; they both have several drug convictions.  R.E.T. told a Child Protective Services (CPS) investigator that Mother was not home when A.T. sexually abused him because she was in jail.  R.E.T.'s father C.T. died in 2006 as a result of a drug overdose.  R.C. and Mother have not appealed the termination of their parental rights.

with the appropriate information and that it is in A.J.T.'s best interest to pursue this placement option.

## A. Standard of Review

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in

the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

    (A)    the desires of the child;

    (B)    the emotional and physical needs of the child now and in the future;

4

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Evidence

Laura Siqueiros, the family-based safety services (FBSS) worker testified that she was assigned to the case in January 2011, prior to CPS's decision to remove the children. Siqueiros said that she spoke with A.T.'s mother but did not recall when and that she gathered his mother's contact information and passed it

5

on when the case was transferred to a CPS caseworker at the end of February 2011.

Melanie Scott, the current CPS caseworker, testified that she entered the case in May 2011. She stated that thirteen-year-old R.E.T. had been placed at a residential treatment center in Houston and had only recently started addressing some of his sexual abuse issues. Eleven-year-old A.J.T. and three-year-old R.A.C. were together in the same foster home.

Scott testified as follows with regard to her interaction with A.T.:

Q. During this case, has [A.T.] personally given you the name of a person that you have been [able] to run National Criminal Information checks on, CPS history on, that you have been [able] to get an approved home study on, and that you have been [able] to get this court to approve placement of his children with?

A. No.

Q. In fact, did you have a telephone conversation with [A.T.] in mid-August, 2011?

A. Yes, I did. He telephoned me and I talked with him. I told him I would be sending his family service plan to him, asked him if they had any questions. He did not, basically, and that was the conversation was I told him I would be sending him a family service plan. I did obtain an address, and I did send it to him certified mail.

Q. And did he say anything in that conversation that day, hey, have you home-studied this person or this is someone that my boys could go live with?

A. No, he did not.

Q. All right. And just to be clear, are [A.J.T.] and [R.A.C.] living in a foster home today?

A. Yes.

Q. Okay. How many times, Ms. Scott, in the last seven months has [A.T.] mailed you letters or cards asking you to tell his boys that he loves them, he cares for them, he's concerned for their well-being, things like that?

A. No times at all.

Q. All right. Has [A.T.] been [able] to show that he can protect [A.J.T.] and [R.A.C.] from emotional and physical danger both now and in the future?

A. No, he has not, and him being incarcerated and being sentenced for 15 years shows that he's not [able] to protect them emotionally or physically.

Q. All right. Well, what about his sexual abuse of [R.E.T.], the oldest child in this sibling group? Does that play into your assessment of whether or not [A.T.] can protect his sons from emotional and physical danger now and in the future?

A. Yes, it does. He's a registered sex offender and he has more than one conviction of sexual abuse.

Q. Has [A.T.] been [able] to show that he can provide [A.J.T.] and [R.A.C.] with safe and stable housing?

A. No, he's not.

Q. Why do you say no to that?

A. Well, because he's incarcerated. He's not once written or notified me of any concerns or asked me how the children are doing, even after I've sent him the service plan and sent my information, my address and telephone number.

Q. Has he given you the names of any family members that you [have] been [able] to successfully home-study and make temporary possessory conservators of his children?

A. No, he has not.

Q. Has [A.T.] shown that he can provide [A.J.T.] and [R.A.C.] with minimally-adequate health and nutritional care?

A. No, he's not.

7

Q. Has [A.T.] shown that he can appropriately discipline [A.J.T.] and [R.A.C.]?

A. No.

Q. Has [A.T.] shown that he can supervise [A.J.T.] and [R.A.C.] consistently with the boys' safety needs?

A. No.

Q. Do you believe that it's in [A.J.T.'s] and [R.A.C.'s] best interest that this court today terminate [A.T.'s] parental rights to each of these boys?

A. Yes, I do.

Q. And would you just summarize for us why you believe that's in [A.J.T.'s] and [R.A.C.'s] best interest?

A. Because of his sexual convictions, and he's was [sic] going to be incarcerated for the next 15 years.

Q. What about his sexual abuse of [R.E.T.]? Does it play a role in it?

A. Yes, it does.

During cross-examination, Scott testified that she did not contact A.T.'s mother to see if she would be an appropriate placement for the children because when she received the case, there was a home study already being performed on another relative so that the children could remain together. She did not follow up with A.T.'s mother because when she spoke with A.T. on the phone, "he never mentioned the children being placed with his mother." Scott also said that A.T. did not give DFPS his mother's name or her contact information.

Scott said that DFPS's plan for A.J.T. and R.A.C. was to place them with R.C.'s sister Amy (a pseudonym) and to give Amy possessory managing

8

conservatorship of the children. Scott said that it would be in A.J.T.'s and R.A.C.'s best interest to be placed with Amy because she had seen Amy interact with the children and A.J.T. had told her that he wanted to live with Amy. Scott said that Amy is a professional nanny, is very mature and stable, and is bonded with the children; Amy has told Scott that she would be willing to adopt the two boys.

The trial court admitted CPS's home study of Amy's home.[5] The home study reflects that Amy has worked as a nanny for twenty-five years, that Amy wanted the children placed with her because they are her nephews and she loves them and wants what is best for them, that Amy has no criminal history or CPS history, and that Amy has a job, a home, and a support network to help her care for the children. Mother agreed that if she could not have custody of A.J.T. and R.A.C., Amy was the best person for the two boys and that the two boys love Amy.

A.T. was present at trial but chose not to testify, and he did not put on any evidence.

The children's ad litem attorney recommended Amy to the trial court as "an excellent placement for the two little ones who seem to be doing pretty well since they've gotten out of the situation they were in." A.T.'s sole closing argument

---

[5]CPS was also conducting a home study on one of R.E.T.'s paternal aunts in San Antonio for R.E.T.'s placement upon his successful discharge from the residential treatment center.

was to request that if the children's placement broke down "that his mother be considered actively for placement of his children."

## C. Analysis

A.T. argues that A.J.T. was denied better permanence "by the Government's failure to explore the option of placing" A.J.T. with A.T.'s mother.

Until DFPS identifies a relative or other designated individual qualified to be a substitute caregiver, the department must continue to explore substitute caregiver options, and DFPS may place a child with a relative or other designated individual *identified by a parent or other person having legal custody of a child* if it determines that the placement is in the child's best interest.[6] *See* Tex. Fam. Code Ann. §§ 261.307(a) (West 2008), 262.114 (West 2008 & Supp. 2012). Further, "[t]he determination of where the child will be placed is a factor in evaluating the child's best interest, but it is not a bar to termination that placement will be with non-relatives." *In re K.W.*, No. 02-09-00041-CV, 2010 WL 144394, at *10 (Tex. App.—Fort Worth Jan. 14, 2010, no pet.) (mem. op.); *see also In re D.C.*, No. 01-11-00387-CV, 2012 WL 682289, at *13 (Tex. App.—Houston [1st Dist.] Mar. 1. 2012, pet. denied) (mem. op.) (stating same).

---

[6]We have previously noted that family code section 262.114 does not prescribe a sanction or consequence for DFPS's failure to complete a home study. *In re J.F.*, No. 02-07-00007-CV, 2007 WL 2963690, at *6, 8 (Tex. App.—Fort Worth Oct. 11, 2007, pet. denied) (mem. op.) (concluding that it is the children's safety that is of paramount importance with regard to a DFPS placement), *disp. on merits*, No. 02-08-00183-CV, 2009 WL 806889, at *9 (Tex. App.—Fort Worth Mar. 26, 2009, pet. denied) (mem. op.).

Based on the testimony at trial, the trial court could have concluded that A.T. did not suggest to his CPS caseworker that his mother was a potential placement for A.J.T. *Cf.* Tex. Fam. Code Ann. §§ 261.307(a), 262.114. Further, there was no evidence at trial that A.T.'s mother wanted A.J.T. or would have been an appropriate placement for him or that A.J.T. would want to go to her. *Cf. D.C.*, 2012 WL 682289, at *13 (noting that there was evidence that paternal aunt did not want the children and no evidence that the children knew her or wanted to live with her). Additionally, placement with Amy, a professional nanny and A.J.T.'s step-aunt, allowed A.J.T. to remain with his half brother R.A.C., and the record reflects that Amy was a stable, permanent placement for both boys and that A.J.T.'s preference was to be with her. *See Holley*, 544 S.W.2d at 371–72; *cf. Horvatich v. Tex. Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 599–600, 603–04 (Tex. App.—Austin 2002, no pet.) (concluding, when DPRS failed to provide any testimony regarding its plan for the children, including whether DPRS would attempt to place the siblings together, and the children's maternal grandmother testified that she told DPRS that she wanted custody of the children and had worked services to be considered a placement, there was insufficient evidence to show that termination of parental rights was better for the children than placement with a viable relative).

Viewing the record in the light most favorable to the finding and the judgment, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of A.T.'s parental rights was in A.J.T.'s best

11

interest despite A.T.'s mother not being considered for placement. *See J.P.B.*, 180 S.W.3d at 573. And based on the entire record, we reach that same conclusion. *See H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually sufficient to support the trial court's best interest finding, and we overrule A.T.'s sole issue.

## IV. Conclusion

Having overruled A.T.'s sole issue, we affirm the trial court's judgment.

PER CURIAM

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED: August 16, 2012